Judge Robertson,
delivered the opinion of the Court.
In 1807, William M’Millan sold a tract of land, part of that on which he resides, to Jsaac Keas, at the same time, Keas executed the following covenant. “Whereas, I have this day taken William M’Millan’s bond, for a conveyance to. a certain tract of land, therein described, and passed my obligation, •to pay him £55, in part payment; now if there should be more land contained in the said bounds, as described in said obligation, than 60 acres, I do hereby oblige myself, to pay to the said M'MHhw, in cash, 40 shillings per acre, for each acre, above the quantity of sixty.”
‘.‘In testimony whereof, I have hereunto set my hand and seal, this 2d day of May, 1807.”
“N. B. If the said M’Millan, dont like to take 40-shillings per acre, as above, at the time o.t payment, he is to have the price, that two disinterested men may value it to, above forty shillings.”
ISAAC KEAS, (Seal.”)
In 1810, M’Millan acknowledged a deed, for the consideration of £ 120. 1 '
In 1823, in a suit pending in chancery, between Buckner, complainant, and said M’Millan and Keas, defendants, (but for what, does not appear, as the record of that suit, is not made a part of this) M’Mil-lan made his answer, a cross bill against Keas, in which he alleged, that there were 72 acres and a fraction, in the tract of land, which he had sold to Keas, and for which he prayed a decyee, upon the valuation of persons to be appointed by the chancellor. Keas demurred to the bill; but the demurrer was overruled-
Keas having died, a bill of revivor was filed against his heirs and personal representatives. The process however, was executed on the administrators only; and consequently, the heirs were pot made parties. *13 The administrators in their answer, deny the jurisdiction of the court, and all the allegations of the cross bill, except the execution of the covenant by their intestate.
Covenant to P“J' f°(Fas“r' fn^’tract'o’f land, without designating time, reters to time of pay-“g”affotrhaie tract, and the value at. that time>tl)e ori" terion of damages, the price not being stipulated
*13 The court by an interlocutory order, appointed Thomas Worrall and Joel Quisenberry, to value the surplus, supposed to be contained in the boundary of the tract, and instructed them to report the value of it, as unimproved land, at the time of assessment. They reported that the land as woodland, was worth ‡25 30 cents per acre, at which rate, the court rendered a final decree, for 12 acres and a fraction.
This decree must be reversed for several reasons.
1st. From any thing alleged in the cross bill, or exhibited in this record, M’Millan’s remedy at law on the covenant was full and complete. And we perceive nothing which should transfer from a court of law to chancery, the jurisdiction of the case. E[e does not pray for a restitution of the surplus, and although his equitable lien on the land, would give the chancellor jurisdiction, yet not having made the heirs parties, the proceeding is against the administrator alone.
We therefore are of opinion, from the face of the record before us, that the chancellor had no jurisdiction. M’Hiillan did not seek a recovery, and of the alleged surplus. He sought its value alone.
If the chancellor could have taken cognizance of the case, the heirs of Keas should have been made defendants, because no decree could be rendered, affecting the land, without making them defendants.
2d. The proper criterion of value, was misconceived.' The value of the surplus at the time, when the consideration for the 60 acres fell due, was, as it seems to us, the standard fixed by the parties, according to any consistent or reasonable construction of .t ' __. the covenant.
All the land within a designated boundary was sold to Keas. It was supposed that the boundary contained 60 acres. Keas was to give forty shillings per acre, for all the land which he purchased. He exe *14 cuted his bond, on a credit, for about half the price of sixty acres, having paid the remainder in some other way. When he gave his bond for the money,' it was apprehended that there might be a surplus in the tract. Forty shillings per acre was the price to he paid for it, (if there existed any,) and it is therefore manifest, that if the surplus had then been ascertained,it would have been included in thebond, for the consideration. But as it was not known certainly, whether there was a surplus or not, Keas executed a covenant, binding himself to pay 40 shillings per acre, for any surplus. The nature of the contract, and the tenor of the bond thus far, leave no room for doubt, that 40 shillings, was the utmost which he engaged to pay. When was he to pay it? When he paid ofFhis bond, if it should be ascertained in the mean time, that there was a surplus; because that was the time, when the surplus would have been paid for if its existence had been known, when the bond was executed. Does the “noto 6ene” affect this construction? We think not. It only provides that M’Millan may have more than 40 shillings, if, “at the time of payment” he should be dissatisfied with that price, and if disinterested men should value the land to more. But it does not fix “the time of payment.” It refers to the time of payment, contemplated in the covenant, and does not change that time.
This construction is somewhat fortified by a consideration “dehors'1' the covenant. It is to be presumed, that men, when they make contracts, are rational? and consult their interest, It should be taken for granted, that Keas was prudently regardful of his interest, and that M'Millan was not unreasonable or unjust in his aims. Is it then, according to this view, probable, “a priori,” that Keas would have bound himself to pay for the surplus, any sum to which it might be valued, at any time or at an indefinite timet And is it probable, that M’Millan would have made such a requisition? We think not. “The time of payment” was the time fixed on, for paying for the tract of .land.
But it is not material to decide this question. There is still another point, which is more fatal to the *15 relief, granted by the decree. It is, that there is no surplus. This is so obvious to our minds, that we are ai a loss to conjecture, bow any controversy have arisen.
In the boundary conveyed by M’Millan, there is a fraction of an acre less than 60 acres. In that charged by M’Millan, to be the boundary, there are 72 acres and a fraction. If M’Millan sold and conveyed, to Keas, to the boundary, which contains 72 acres, he ought to be paid for the 12 acres. But if he conveyed only to the boundary, containing the 59 acres and a fraction, he is entitled to no decree, because the land for which he asks it, has never been sold by him, and is yet his, if it ever was'.
The courses, distances, correspondence of objects, quantity, and many other coincidences, leave no room for a rational doubt, that 1,7 is the proper and the actual line between the parties, and not G, 8. We will not enter into a survey of the various facts which would demonstrate this. Such an explanation without the platt, would be unintelligible. It is sufficient to say, that we have no doubt, that the land included in the boundary, 1, 7, 8, G, is not included in M’Millan’s deed to Keas; and, that consequently, not only did Keas not acquire title to more than 60 acres; but this deed conveyed to him less. M’Millan might have intended to convey to the line G, 8; but he certainly did not do it. M’Millan has no just claim on the heirs of Keas. The land for which he claims §25 an acre, was never theirs, or their father’s. It is M’Millans, and he cannot compel the heirs to purchase the land from him. With this opinion, he should be satisfied; because, when he ascertains that the land is his, he will not want pay for it.
Decree reversed, and cause remanded., with instructions to dismiss the bill. '
Since the foregoing opinion was delivered, it has been suggested by the counsel of M’Millan, that the heirs of Keas still hold the bond of M’Millan, which was executed in 1807, and that the boundaries designated in that, are different from those described in the deed, and do include the 12 acres of surplus; and *16 on this ground as well as some others, it is suggested that ^ wou^ be desirable, that the mandate should be so far modified, as to leave the cause open for amendment, and further preparation.
Hanson, for plaintiffs;
This,the record will not, in our opinion, allow as to do. The fact now disclosed, is not intimated by the record. We took it for granted, that the deed corresponded with the bond; and that when the deed was made, the bond was surrendered.
If the fact be as now stated, noinjury to M’Millan can result from it. The legal title to the surplus, is still in him. He can hold it, until he shall be paid for it¿ or he may enforce the covenant of Keas, by a new suify exhibiting the appropriate facts.
But this court must give its opinion On the record; It cannot change the rights of the parties, as they appear to be on the record, nor modify its mandate; on the suggeston of a fact* “dehors” the record.